## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ARWA & CHANGE ADVOCATES LLP and
JAPHETH CHANGE,

      Plaintiffs,

      v.

SMITH LACIEN LLP, TODD A. SMITH, and
JOHN R. STORINO,

      Defendants.

Case No. 24 CV 6620

Judge Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Plaintiffs Arwa & Change Advocates LLP and Japheth Change bring this suit against defendants Smith LaCien LLP, Todd A. Smith, and John R. Storino, alleging that they are owed a share of the contingency fees stemming from a shared client's settlement agreement. They bring various state-law causes of action as well as claims under 42 U.S.C § 1981, 42 U.S.C § 1985, and the Kenyan Constitution. Defendants have moved to dismiss plaintiffs' complaint in its entirety. For the reasons discussed, the Court grants defendants' motions to dismiss.

### LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff," as it does in the background section that follows. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

On March 10, 2019, Ethiopian Airlines Flight ET 302 crashed shortly after takeoff, killing all 157 people on board. [57] ¶ 9. One victim was Florence Wangari Yongi. *Id.* Her father, Francis Yongi Muturi ("Muturi") retained two law firms to help him sue the Boeing Company ("Boeing"), which manufactured the plane. *Id.* ¶¶ 4, 10, 12–13. The first firm, Arwa & Change Advocates LLP ("ACA"), was based in Nairobi, Kenya. *Id.* ¶¶ 4, 10. The second firm, Power Rogers & Smith LLP ("Power Rogers"), was based here in Chicago, where Boeing maintained its headquarters. *Id.* ¶¶ 12–13.

In June 2019, Muturi, ACA, and Power Rogers entered into a contingency fee arrangement under which the two firms would file suit against Boeing on Muturi's behalf and, in exchange, the firms would equally split 28% of the gross amount

2

Muturi recovered. *Id.* ¶¶ 13–15. In addition to attorneys' fees, Muturi also agreed to reimburse the firms for any "reasonable, ordinary, and necessary expenses and costs [they incurred] in the preparation and prosecution of the suit." *Id.* ¶ 14.

On June 12, 2019, Power Rogers filed suit against Boeing on Muturi's behalf in the U.S. District Court for the Northern District of Illinois ("Wrongful Death Suit"). *Id.* ¶ 16. About a year after filing suit, defendant Todd Smith left Power Rogers and started a new firm called Smith LaCien LLP. *Id.* ¶ 17. After Smith's move, Muturi discharged Power Rogers as counsel and retained Smith LaCien. *Id.* In July 2020, Muturi, ACA, and Smith LaCien entered into a new agreement with the same terms as the previous agreement with Power Rogers: ACA and Smith LaCien would prosecute the suit against Boeing in exchange for 28% of the eventual recovery, to be split equally between the two firms ("July 2020 Agreement"). *Id.* ¶¶ 18–20.

In June 2021, ACA and Muturi entered into a second agreement ("Compensation Fund Agreement") providing that ACA would represent Muturi in obtaining a share of the compensation fund that arose from the government's criminal prosecution of Boeing. *Id.* ¶ 37; *see also* [57-3]. ACA says it "fully performed its obligations under [the Compensation Fund Agreement] and safely delivered Mr. Muturi's share of funds to him on or about August 25, 2021." [57] ¶ 37.

ACA's representation of Muturi ended on February 14, 2022. *Id.* ¶¶ 21, 39. By that date, "ACA had expended more than 2,470 hours in the case and incurred expenses related to its representation." *Id.* ¶ 23. This included "extensive legal research," "numerous meetings and discussions" with Muturi and co-counsel,

"extensive settlement discussions," and "[p]rovid[ing] legal advice to Mr. Muturi on other non-litigation matters." *Id.* ¶ 21. ACA had also participated in a virtual mediation session before a retired judge during which Muturi declined a $5 million offer from Boeing. *Id.* ¶ 22. Around the time Muturi split with ACA, Smith LaCien hired defendant John Storino, a partner at the law firm Jenner & Block LLP ("Jenner"), "to help it manage its relationship with ACA and Mr. Muturi." *Id.* ¶ 55; *see also id.* ¶ 7.

In February 2023, around a year after the relationship between ACA and Muturi ended, Muturi's suit against Boeing settled for an amount ACA believes exceeded $6 million. *Id.* ¶ 24. Plaintiffs contacted Smith and Smith LaCien in November 2023 to obtain what they believed was their share of the settlement money. *Id.* ¶ 30. Plaintiffs allege that, in response, "Storino asked ACA to provide him with a statement indicating how much money it believed it was owed and promised that Smith and [Smith LaCien] would pay." *Id.* After ACA did so, plaintiffs say Smith and Smith LaCien "have refused to pay any portion of the amount" they received from the settlement. *Id.* ¶ 33.

In July 2024, plaintiffs filed a six-count complaint against Smith LaCien, Smith, Storino, and Jenner, bringing various state-law causes of action. *See generally* [1]. In response to defendants' subsequent motions to dismiss, [18]; [21], plaintiffs filed an amended complaint in October 2024, [29]. Defendants moved to dismiss the amended complaint, [38]; [41], and plaintiffs again amended their complaint before the Court ruled on defendants' motions, [57]. The second amended complaint brings

10 counts: (1) breach of implied contract against Smith and Smith LaCien; (2) breach of fiduciary duty against Smith LaCien; (3) tortious interference with prospective economic advantage against Smith and Smith LaCien; (4) tortious interference with prospective economic advantage against Storino; (5) unjust enrichment against Smith and Smith LaCien; (6) adjudication of equitable lien against Smith and Smith LaCien; (7) violation of 42 U.S.C § 1981 against all defendants; (8) violation of 42 U.S.C. § 1985(2) against Jenner, Storino, and Smith; (9) malicious arrest, detention, and prosecution against Smith LaCien; and (10) violation of the Kenyan Constitution against Smith and Smith LaCien. *See generally* [57].

After plaintiffs filed their second amended complaint, plaintiffs moved under Federal Rule of Civil Procedure 41 for an order terminating Jenner from the case. [68]. The Court construed the motion to drop Jenner as a party as a motion for leave to amend under Federal Rule of Civil Procedure 15 and granted the motion. [91]. Pursuant to the parties' agreement, in lieu of filing a third amended complaint, the parties agreed to deem the second amended complaint as having dropped all claims against Jenner. *Id.* The remaining defendants have moved to dismiss all counts of plaintiffs' second amended complaint. [62]; [65].

## DISCUSSION

Defendants first argue that Counts II, III, IV, and X are barred by the absolute attorney litigation privilege recognized under Illinois law. The Court first addresses this threshold issue; it then considers defendants' arguments against plaintiffs' remaining claims.

5

### A. Absolute Attorney Litigation Privilege

Defendants contend that Count II (breach of fiduciary duty against Smith and Smith LaCien), Count III (tortious interference against Smith and Smith LaCien), Count IV (tortious interference against Storino), and Count X (violation of the Kenyan Constitution against Smith and Smith LaCien) are barred by Illinois' absolute attorney litigation privilege. [63] at 7–10. Before determining whether the privilege bars these claims, the Court first must determine which jurisdiction's law applies. While defendants claim Illinois law applies, plaintiffs ask the Court to apply Kenyan law. [66] at 5–6; [81] at 3–4.

Federal courts hearing state law claims via supplemental jurisdiction apply the forum state's choice-of-law rules. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)). Illinois has adopted the Second Restatement of Conflict of Laws, which "is constructed around the principle that the state with the most significant contacts to an issue provides the law governing that issue." *Ruiz v. Blentech Corp.*, 89 F.3d 320, 323–24 (7th Cir. 1996) (citing *Ingersoll v. Klein*, 46 Ill.2d 42, 48 (1970)). The Second Restatement follows the principle of *depecage*, which means that a court conducts "a separate choice-of-law analysis for each issue in a case, attempting to determine which state has the most significant contacts with that issue." *Id.* (citing *Int'l Adm'rs, Inc. v. Life Ins. Co. of North Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985)). In *Ruiz*, the Seventh Circuit reaffirmed that district courts should analyze choice of law issue-by-issue and not throw a "single analytical blanket over all of the issues in [a] case." *Id.* at 326; *see also*

*Ryan Beck & Co. v. Campbell*, No. 02 C 7016, 2003 WL 21697364, at *1 (N.D. Ill. July 18, 2003) (the principle of *depecage* articulated in *Ruiz* requires courts to "cut[ ] up a case into individual issues"); *J.A.G.P. through Lopez v. Aerolineas Damojh, S.A. de C.V.*, No. 1:19-CV-02552, 2024 WL 4007719, at *3 n.5 (N.D. Ill. Aug. 30, 2024) (same).

Applying *depecage*, the Court applies the law of the jurisdiction with the most significant contacts to the issue of the absolute attorney litigation privilege. Here, that forum is clearly Illinois. Storino and Smith are Illinois-based attorneys, and Smith LaCien is an Illinois-based law firm. [57] ¶¶ 5, 7. Illinois therefore has a strong interest in protecting Storino's, Smith's, and Smith LaCien's litigation-related conduct while practicing within the state. *See O'Callaghan v. Satherlie*, 394 Ill.Dec. 708, 717 (Ill. App. Ct. 2015) (explaining that the privilege is required to provide attorneys with "the utmost freedom in their efforts to secure justice for their clients" and that the privilege "furthers an attorney's need to fully and fearlessly communicate with his client and the free flow of truthful information to the courts") (internal citation omitted). Defendants argue that Kenyan law applies because the complained-of conduct all occurred in Kenya, [80] at 4; [81] at 3, but they do not offer any support for the proposition that Storino, Smith, or any Smith LaCien attorney practiced law in Kenya (or even traveled to Kenya) in connection with the actions alleged in the complaint. Indeed, nothing in the complaint supports a conclusion that defendants' relevant litigation activities took place anywhere outside Illinois. The Court therefore relies on Illinois law to evaluate defendants' claim that Counts II, III, IV, and X are barred by the absolute attorney litigation privilege.

Illinois follows the Second Restatement of Torts, which provides that "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *O'Callaghan*, 394 Ill. Dec. at 717 (quoting Restatement (Second) of Torts § 586 (1977)). "The only requirement for the application of the attorney litigation privilege is that the communication must pertain to proposed or pending litigation." *Scarpelli v. McDermott Will & Emery LLP*, 426 Ill.Dec. 821, 829 (1st Dist. 2018). This requirement "is not strictly applied" and protects an attorney "even when the communication is not confined to specific issues related to the litigation." *Id.* "As long as it relates to the litigation and is in furtherance of representation, the privilege applies," and any doubts are resolved in favor of applying the privilege. *Id.*

Plaintiffs offer scarcely anything to support their claim that Illinois' absolute attorney litigation privilege does not cover the specific conduct making up Counts II, III, IV, and X. They argue in passing that the conduct complained about "extends to non-litigation matters." [80] at 4; [81] at 3. Yet to support this argument, they only cite to a single allegation in the complaint stating that Storino "purposefully interfered with ACA's attorney-client relationship with Mr. Muturi as it relates to other matters outside of the lawsuit." [57] ¶ 57.[1] Plaintiffs do not describe any

---

[1] As to Smith and Smith LaCien, plaintiffs cite to their second amended complaint, [81] at 3, but they do not cite to any specific allegations suggesting that Smith and Smith LaCien's conduct was not related to pending litigation.

8

specific, non-litigation conduct unprotected by the privilege.[2] The Court will not make plaintiffs' arguments for them. *See Tyler v. Runyon*, 70 F.3d 458, 470 (7th Cir. 1995). Nor is it satisfied by threadbare, conclusory allegations. *See Iqbal*, 556 U.S. at 678.

The Court's own review of the second amended complaint suggests that the conduct alleged in connection with Counts II, III, IV, and X was indeed related to ongoing litigation. That conduct is therefore immune from suit. Counts II and III against Smith and Smith LaCien are based on their alleged false statements to Muturi regarding the Compensation Fund Agreement and Muturi's subsequent decision to terminate ACA as counsel on the Wrongful Death Suit. [57] ¶¶ 38–39, 47–48. Count IV is based upon Storino's supposed interference with ACA and Muturi's relationship, in plaintiffs' own words, "*as it relates to the lawsuit*," thus leading to Muturi's termination of ACA as counsel. *Id.* ¶ 56 (emphasis added). And Count X is premised upon plaintiffs' allegation that Smith and Smith LaCien induced Muturi to institute a criminal proceeding against Change so as "to deny ACA its legal right to earned attorney's fees and costs" stemming from the Wrongful Death Suit. *Id.* ¶¶ 94–102. Each of these actions was related to ongoing litigation and therefore is protected by the absolute attorney litigation privilege.

Counts II, III, IV, and X are dismissed with prejudice.

---

[2] Plaintiffs make a passing reference to Storino "providing advice on how to invest funds received from Boeing from the settlement of the lawsuit," [57] ¶ 57, but this conduct was related to Muturi's litigation against Boeing. In any case, the Court does not see how merely providing investment advice can support plaintiffs' claim for tortious interference, and plaintiffs do not articulate a plausible connection.

### B. Remaining Claims

#### 1. Breach of Implied Contract (Count I)

ACA alleges that in November 2023, Smith and Smith LaCien agreed to pay ACA "for the value of its services that it provided in connection with the Muturi co-representation upon receipt of ACA's statement indicating how much money it believed it was owed." [57] ¶ 31. As ACA sees it, this agreement created an implied contract that Smith and Smith LaCien breached when it failed to pay ACA a portion of the contingency fees from Muturi's settlement, after "Storino asked ACA to provide him with a statement indicating how much money it believed it was owed" and after Storino "promised that Smith and [Smith LaCien] would pay." *Id.* ¶ 30.

"An implied contract arises where the intention of the parties is not expressed but an agreement in fact creating an obligation is implied or presumed from their acts—in other words, where circumstances under common understanding show a mutual intent to contract." *Brody v. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 298 Ill. App. 3d 146, 154 (Ill. App. Ct. 1998). "A contract implied in fact must contain all elements of an express contract, and there must be a meeting of the minds." *Foiles v. N. Greene Unit Dist. No. 3*, 261 Ill. App. 3d 186, 190 (Ill. App. Ct. 1994).

Smith and Smith LaCien argue that Storino's alleged "promise" in November 2023 to pay ACA a portion of the contingency fee was not an implied contract because it lacked consideration. [66] at 10. The Court agrees with Smith and Smith LaCien that the previous work ACA performed under the July 2020 Agreement cannot

10

constitute consideration for the alleged implied contract formed in November 2023. *See Johnson v. Johnson*, 244 Ill. App. 3d 518, 528 (Ill App. Ct. 1993) ("[T]he general rule dictates that if the alleged consideration for a promise has been conferred prior to the promise upon which alleged agreement is based, there is no valid contract."). And when Muturi terminated ACA as counsel in February 2022, the July 2020 Agreement ceased to exist, so ACA is not entitled to fees under that contingency fee arrangement. *See Leoris & Cohen, P.C. v. McNiece*, 226 Ill. App. 3d 591, 595 (Ill. App. Ct. 1992) ("[E]ven though a contingency fee is generally paid out of the recovery for the client, when a client terminates the contract, the contract ceases to exist between the parties.").

Instead of relying on the July 2020 Agreement, ACA says its consideration in November 2023 was "exchang[ing] its legal right to compensation for the services it provided in the Wrongful Death Suit from the payments that Defendants agreed to provide." [81] at 4. But even assuming that the giving up of a legal right to compensation is valid consideration,[3] this theory of consideration does not appear on the face of plaintiffs' complaint. *See generally* [57] ¶¶ 26–34. Plaintiffs allege only that "an implied contract arose" when Smith and Smith LaCien agreed to pay ACA "for the value of its services that it provided in connection with the Muturi co-representation upon receipt of ACA's statement indicating how much money it believed it was owed." *Id.* ¶ 31. In recounting this exchange, plaintiffs at no point

---

[3] At a minimum, the Court doubts that this is the case based on this record, where, as the Court explains throughout the course of this opinion, plaintiffs have not articulated a valid claim for relief based on Smith LaCien's failure to pay it some portion of the fees from Muturi's settlement.

11

allege what, if anything, they offered in exchange. *Id.* ¶¶ 30–31. (And although the second amended complaint is now the operative one, the Court notes that previous versions of the complaint were silent on the same topic. *See generally* [1], [29].) Without any relevant allegations to evaluate, the Court cannot say whether there was a "meeting of the minds or mutual assent as to the terms" as required for contract formation. *Acad. Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30 (1991).

Count I against Smith and Smith LaCien is therefore dismissed without prejudice.

### 2. Unjust Enrichment (Count V)

To state a claim for unjust enrichment in Illinois, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989). Where a benefit has been transferred to the defendant by a third party, "retention of the benefit would be unjust where (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 161–62 (internal citations omitted).

None of these scenarios appear here. ACA does not allege that the entire contingency fee was given to defendants by mistake or that plaintiffs—who were not

counsel for Muturi at the time the settlement was reached—have a better claim to the settlement funds than defendants, who were Muturi's counsel at the time of the settlement. Nor can plaintiffs legitimately claim that defendants procured a benefit from Muturi through some type of wrongful conduct. As the Court already has noted, ACA's right to collect contingency fees under the July 2020 Agreement ended when Muturi terminated the firm as counsel. *See Leoris & Cohen*, 226 Ill. App. 3d at 595.

When a client terminates a contingency fee contract, the "discharged attorney may recover only under a theory of *quantum meruit.*" *Layden v. Chicago Title Land Tr. Co. as Tr. of Chicago Title Land Tr. Co. Tr. No. 8002362712*, 479 Ill.Dec. 444, 454 (Ill. App. Ct. 2024); *see also Callahan*, 144 Ill. 2d at 37; *Andrew W. Levenfeld & Assocs.*, 479 Ill.Dec. at 60. But plaintiffs do not bring a *quantum meruit* claim— indeed, they specifically disclaim their ability to bring one under the factual circumstances presented.[4]

ACA's Count V claim for unjust enrichment is dismissed without prejudice.

---

[4] Plaintiffs maintain that "*quantum meruit* is inapplicable because that authority only refers to a former attorney's remedy against a client, not third parties like Defendants in this case," but it provides no citation to legal authority suggesting that is the case. [81] at 7. Because plaintiffs do not actually bring a *quantum meruit* claim, and it is not the Court's job to make plaintiffs' argument for them, the Court takes no position on whether such a claim would be proper under the circumstances.

### 3. Equitable Lien (Count VI)

Count VI asserts a claim for an equitable lien against Smith and Smith LaCien. [57] ¶¶ 68–75. An equitable lien "is a remedy for a debt that cannot be legally enforced but, based upon considerations of right and fairness, should be recognized." *Bank of Am., N.A. v. Schroeder*, 454 Ill.Dec. 512, 522 (Ill. App. Ct. 2021). "To assert an equitable lien, the plaintiff must establish the following two elements: (1) a debt, duty, or obligation owed to the plaintiff by the defendant; and (2) the existence of a res, an asset that in some way is particularly related to the debt or obligation." *Id.* Here, ACA does not establish that Smith and Smith LaCien owe it a debt, duty, or obligation. ACA claims that such an obligation arose from the July 2020 Agreement, yet by the time Muturi's suit against Boeing settled, Muturi had terminated its agreement with ACA. *Id.* ¶¶ 21, 39.

ACA's Count VI claim for an equitable lien is dismissed without prejudice.

### 4. Section 1981 (Count VII)

Section 1981 provides that "[a]ll persons … shall have the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute applies to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To state a claim under § 1981, a plaintiff must plead that (1) they are a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerns the making or enforcement of a contract. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d

14

751, 756 (7th Cir. 2006). Section 1981 only covers instances of purposeful discrimination, *see Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982), and a plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right," *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

Here, plaintiffs fail to allege that Change's race played any role in the making or enforcement of a contract. Plaintiffs allege that defendants "violated Plaintiffs' rights to enforce ACA's contract to share fees with [Smith LaCien] when on or about April 2024, Storino asserted that Mr. Change is a criminal based solely on his race." [57] ¶ 82; *see also id.* ¶ 83 (similarly alleging that defendants "violated Plaintiffs' rights to enforce [a] contract under 42 U.S.C. 1981 by failing to pay ACA its rightfully earned fee"). But, as discussed, Muturi terminated the July 2020 Agreement with ACA in February 2022—two years before Storino allegedly called Change a criminal. [57] ¶¶ 21, 39. Because that contract was no longer enforceable, plaintiffs cannot claim that race discrimination played any role in defendants' failure to abide by its terms.

Even if there were a valid contract, plaintiffs' allegations of racial discrimination fall short. Without further allegations suggesting racial animus, the Court will not infer—based on a single comment describing Change as "a criminal"— that defendants intentionally discriminated against plaintiffs on account of their race. *C.f. Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44 (D.D.C. 2014) (in the Title

15

VII context, a "single remark … albeit insensitive, is insubstantial to establish direct evidence of racial … discrimination on the part of the defendant").

Plaintiffs further contend that Smith and Smith LaCien "violated ACA's rights when they told Change, ACA's partner, that he was not allowed at [Smith LaCien's] offices in Chicago, Illinois, when he visited to enforce ACA's contract with [Smith LaCien] to share fees, or to or make a new contract to resolve the fee issue." [57] ¶ 81. This also cannot support a § 1981 claim because plaintiffs do not explain how the decision to bar them from the office was racially motivated.

Plaintiffs' Count VII claim under § 1981 is dismissed without prejudice.

### 5. Section 1985 (Count VIII)

Plaintiffs also claim Storino violated 42 U.S.C. § 1985, which prohibits "conspir[ing] to deter, by force, intimidation, or threat" a party or witness to a federal court proceeding "from attending … or from testifying" in federal court. 42 U.S.C. § 1985(2); *see also Kush v. Rutledge*, 460 U.S. 719, 725 (1983). Specifically, plaintiffs allege that "ACA and Change had claims for legal fees and costs" in Muturi's suit against Boeing and that "Smith, Storino and others … conspired to deter by intimidation or threat, Change, a witness in the case in the claim for legal fees and costs, from testifying freely, truthfully and fully in the claims." [57] ¶¶ 89–90.

Plaintiffs' allegations fall well short of stating a § 1985 claim. To start, plaintiffs do not allege that Change was ever called to testify in the Wrongful Death Suit, nor do they allege that Change was ever deterred from attending the proceedings in that case. *Id.* ¶¶ 88–92. Moreover, besides conclusory allegations that

16

Storino and others "created a false story to paint Change as a criminal," plaintiffs do not allege that they acted together to deter Change from testifying in court. *Id.* ¶ 90. Finally, to state a § 1985 claim, plaintiffs must have used "force, intimidation, or threat" to deter plaintiff from attending the proceedings or testifying in them. 42 U.S.C. § 1985(2). Plaintiffs allege nothing of the sort here.

Plaintiffs' Count VIII claim under § 1985(2) is dismissed without prejudice.

### 6. Malicious Prosecution (Count IX)

To state a malicious prosecution claim under Illinois law, a plaintiff must plead: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996) (quoting *Joiner v. Benton Cmty. Bank*, 82 Ill.2d 40, 45 (1980)).

Change does little more than recite the elements of a malicious prosecution claim. For example, although he alleges that "Smith instituted the criminal proceedings against Change without reasonable or probable cause," he alleges no details about the suit to support that the criminal proceeding indeed lacked probable cause. [57] ¶ 96; *see also id.* ¶¶ 94–100. Moreover, besides a conclusory allegation that Smith "acted maliciously," *id.* ¶ 97, plaintiffs plead no facts supporting that Smith acted with malicious intent, *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Finally, Change's allegations do not sufficiently tie the criminal proceeding

17

to Smith LaCien. Although Change alleges in a conclusory fashion that Smith "induced" Muturi to institute a criminal proceeding against Change, *id.* ¶ 94, he alleges no details permitting the inference that Smith LaCien and not Muturi was ultimately responsible for the commencement of the suit.

Change's Count IX claim for malicious prosecution is dismissed without prejudice.

CONCLUSION

For the foregoing reasons, the Court grants defendants' motions to dismiss. [62]; [65]. Counts II, III, IV, and X are dismissed with prejudice, while the remaining counts are dismissed without prejudice.

Plaintiffs are granted leave to file an amended complaint by 7/22/25 if they can cure the deficiencies the Court has identified with their claims while still complying with their Rule 11 obligations. Given the number of opportunities plaintiffs already have had to amend their complaint, *see supra* at 4–5, this will be plaintiffs' final opportunity to do so. If plaintiffs do not submit an amended complaint by 7/22/25, the dismissal will automatically convert to a dismissal with prejudice, and the case will be terminated.

_____
Georgia N. Alexakis
United States District Judge

Date: 7/1/25